# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No.58221-0-II |
| Respondent, | |
| v. | |
| VICTOR DONNELL ABERNATHY, | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, J. – Victor Abernathy appeals his convictions of six counts of first degree assault, drive by shooting, and unlawful possession of a firearm. He also appeals his sentence that included six consecutive 60 month firearm enhancements.

We hold that (1) Abernathy was not deprived of his right to participate in his defense when he did not receive discovery by the start of trial because his attorney received all discovery, reviewed it with Abernathy, and advised the trial court that he was ready for trial; (2) the trial court did not err when it denied Abernathy's motion for a mistrial after a witness referred to Abernathy by a nickname; (3) we decline to address whether the trial court erred when it ruled that it lacked discretion to reduce the six mandatory 60 month statutory firearm enhancements on Abernathy's sentence because Abernathy invited any error; and (4) Abernathy's claims raised in a statement of additional grounds (SAG) cannot be considered, were waived, or lack merit.

Accordingly, we affirm Abernathy's convictions and sentence.

FACTS

*Background*

On March 27, 2022, Melinda James, Dartanion Killian-Horace and James's four children went grocery shopping. Killian-Horace's sister has two children with Abernathy. As James and Killian-Horace were exiting the grocery store, they noticed a red Mustang convertible with a beige top driving past them.

Abernathy was driving the red Mustang. He dropped off his then-fiancée Moriah[1] at the grocery store entrance at the same time Killian-Horace and James exited the store. While James was loading groceries into her vehicle, Abernathy parked nearby and got out of his car. Abernathy and Killian-Horace got into an argument, and said they wanted to fight each other.

At one point, Killian-Horace ducked behind a nearby car. Killian-Horace told James that Abernathy had grabbed a gun from his car and charged at him. Eventually, Abernathy drove away.

While James and Killian-Horace were driving home with the children, they saw a red Mustang with the top down driving behind them. It was the same Mustang that Abernathy had been driving at the grocery store. The Mustang followed James and Killian-Horace. At some point, the Mustang drove into the lane next to James' car and the driver fired gunshots into the car. James quickly drove away. No one in the car was physically injured by the bullets, but James' children were crying and screaming while the shooting occurred. James's daughter confirmed that the shooter was the same person from the grocery store parking lot. James called 911 when she got home at 7:10 P.M.

---

[1] Victor and Moriah were married before trial. Because Moriah and Victor share the same last name, we will refer to Moriah by her first name. No disrespect is intended.

Abernathy picked Moriah up from the grocery store at 7:28 P.M. Moriah did not know where Abernathy had been while she was grocery shopping.

The State charged Abernathy with six counts of first degree assault and six counts of second degree assault, all while armed with a firearm, drive-by shooting, and second degree unlawful possession of a firearm.

*Pretrial Proceedings*

At a trial readiness hearing, Abernathy asked, "So if my discovery isn't in by then, are we still gonna have to go on with the trial?" Rep. of Proc. (RP) (Mar. 17, 2023) at 4. Abernathy's attorney explained that Abernathy had requested a copy of the police reports in the case, and "that fell through the cracks on my end. I'm going to be asking [the Department of Assigned Counsel] to expedite a redaction of that evidence. Other materials have been reviewed with Mr. Abernathy." RP (Mar. 17, 2023) at 4. Abernathy asked if the delay would be the basis for a continuance of the trial. The trial court said no, and that the documents "will be available to you. I guarantee it." RP (Mar. 17, 2023) at 5. Both parties acknowledged that discovery was complete and that they were ready for trial.

Abernathy filed a motion in limine to prohibit the State from calling him any inflammatory names, including gang names. The trial court granted the motion in part. Before trial, the court emphasized the importance of the parties avoiding any references to gang affiliation:

> Allow me to be clear: There will be no reference to Crips, Bloods, any other gang affiliation – I think I have made that clear – in toto, whether it's – in toto. Not under any circumstances will there be a reference to Crips and the Bloods, or gang affiliation of Mr. Abernathy, if he has any, gang affiliation of anybody else that's involved in this case as witnesses, period. I don't know how I can make that any more clear other than just saying that for the number of times.

RP at 87.  The court also noted that "the prejudice is ameliorated by use of the word 'nickname' as opposed to street name, gang affiliation name."  RP at 87.

*Jury Trial*

Two witnesses testified that they witnessed a drive by shooting take place on May 27, 2022.  They testified that the shooter was driving a red Mustang with its top down.  One of the witnesses testified that the car was weaving in and out of traffic, and that the driver shot at a dark colored vehicle near them.  That witness called 911 at 6:59 P.M.

James also testified on behalf of the State.  During cross-examination, Abernathy's attorney and James engaged in the following colloquy:

> Q:  Now, in the parking lot of the [grocery store], you had two conversations with Dartanion.  In each one of them, he told you, "That person is Victor Abernathy," correct?
> A:  It wasn't exactly like that, but, yes, basically.
> Q:  "That's Victor, Nese's baby daddy."
> A:  Well, he didn't tell me it was "Victor."  He told it was "Havoc," which that's his nickname.

RP at 292.  Abernathy objected.  The trial court told the jury that James' answer was nonresponsive and instructed the jury to disregard her response.

Abernathy moved for a mistrial because the jury could construe his nickname as a gang name and because the parties had agreed to avoid references to gang affiliations before trial.  The State argued that there was no reason for the jury to believe that "Havoc" was a gang name.

The trial court said,

> I don't think that we are at the point of such a level of prejudice that a mistrial is warranted.  However, I do think I'm going to bring Ms. James in and inform her more directly of the Court's order that there's no reference to gang monikers or anything at all that could be slightly inferred to be referenced to gangs on anybody involved in the case, defendant, witness, anybody.

4

RP at 297.  The court held James in contempt of court, and ordered her not to violate the order again.

Abernathy asked the trial court to give a limited instruction or tell the jury to disregard James' testimony.  The court said, "I think I already did that.  If you don't believe it is enough, I feel like maybe we're in danger of overemphasizing it.  I've indicated on the record that they're to disregard that last answer."  RP at 304.

*Jury Verdict and Sentencing*

The jury found Abernathy guilty of six counts of first degree assault and six counts of second degree assault, and found that he had been armed with a firearm during the commission of the crimes.  The jury also found him guilty of drive by shooting and second degree unlawful possession of a firearm.  The trial court subsequently vacated the second degree assault convictions because they merged into the first degree assault convictions.

During a sentencing hearing, the State requested an exceptional sentence below the standard range for a total of 600 months, which included 360 months of firearm enhancements.

Abernathy requested that the trial court impose an exceptional sentence downward of zero months on the six first degree assault counts and only impose the required firearm sentencing enhancements.  Abernathy stated,

> And, yes, the legislature has removed from the courts the discretion with regards to enhancements and how to run those based upon the jury's specific interrogatory findings in this case.  The imposition of the firearm enhancements of five years each, six of those to run consecutive, does result in a 30-year sentence and that is flat time.

RP (May 12, 2023) at 19.  He pointed out that if the court sentenced Abernathy to 30 years, that would amount to an exceptional sentence downward and stated "by operation of our legislature that [the trial court] does not have any discretion."  RP (May 12, 2023) at 19.

In his statement before sentencing, Abernathy stated that he did not receive the discovery he had requested until the day before the jury began its deliberations.

The trial court sentenced Abernathy to 60 months on the each of remaining eight convictions to be served concurrently, which was an exceptional sentence below the standard range. The court also imposed 60 months on each firearm sentencing enhancement to be served consecutively, for a total of 360 additional months.

Abernathy appeals his convictions and sentence.

ANALYSIS

A.    RIGHT TO PARTICIPATE IN DEFENSE

Abernathy argues that he was deprived of his right to participate in his defense when the trial court allowed the trial proceed before he had received certain discovery documents pursuant to CrR 4.7(h)(3). We disagree.

1.    Legal Principles

Article I, section 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution guarantee a criminal defendant the right to effective assistance of counsel. The constitutional right to effective assistance of counsel includes a reasonable time for preparation and consultation. *State v. Schlenker*, 31 Wn. App. 921, 935, 553 P.3d 712 (2024). It includes "the opportunity for private and continual discussions between the defendant and his attorney at least during critical stages of the prosecution." *Id*.

CrR 4.7 governs pretrial discovery procedures. Former CrR 4.7(h)(3) (2007), titled "Custody of Materials" states,

> Any materials furnished to an attorney pursuant to these rules shall remain in the exclusive custody of the attorney and be used only for the purposes of conducting the party's side of the case, unless otherwise agreed by the parties or ordered by the court, and shall be subject to such other terms and conditions as the parties may

6

agree or the court may provide. Further, a defense attorney *shall be permitted* to provide a copy of the materials to the defendant after making appropriate redactions which are approved by the prosecuting authority or order of the court.

(Emphasis added).

We review discovery decisions based on CrR 4.7 for abuse of discretion. *State v. Vance*, 184 Wn. App. 902, 911, 339 P.3d 245 (2014).

2. Analysis

Former CrR 4.7(h)(3) states that defense counsel has permission to give redacted copies of discovery materials to defendants after approval by the prosecuting authority. However, the rule does not state that defendants have a right to access these materials. Rather, it emphasizes the importance of discovery materials remaining in the custody of the attorney and being used only for the purposes of the party's case.

In this case, Abernathy's attorney received all relevant discovery as required by CrR 4.7, confirmed during the omnibus hearing that he was ready for trial, and presented a complete defense. While there may have been a delay in getting discovery materials to Abernathy, he reviewed other evidence with his attorney and his attorney believed that he had sufficient discovery to proceed with trial. Accordingly, we reject his argument.

B. DENIAL OF MOTION FOR MISTRIAL

Abernathy argues that the trial court erred when it denied his motion for a mistrial after James referred to him by the nickname "Havoc" during cross examination. He argues that the testimony violated the court's exclusion of all evidence of gang affiliation. We disagree.

1. Legal Principles

We review for abuse of discretion the trial court's decision to grant or deny a mistrial. *State v. Gogo*, 29 Wn. App. 2d 107, 114, 540 P.3d 150 (2023). "A trial court's denial of a

mistrial motion will be overturned only when there is a substantial likelihood that the error affected the jury's verdict." *State v. Garcia*, 177 Wn. App. 769, 776, 313 P.3d 422 (2013). The determinative issue is whether the defendant has been so prejudiced that a new trial is required to treat the defendant fairly. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012).

In evaluating whether a trial irregularity warrants a mistrial, we consider three factors: (1) the seriousness of the irregularity, (2) whether the irregularity involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard the evidence. *Id.* We take a balancing approach in assessing the factors, which are designed to determine whether there is a substantial likelihood that the irregularity affected the jury's verdict. *Garcia*, 177 Wn. App. at 783. And these factors are considered with deference to the trial court because the trial court is in the best position to discern prejudice. *Id.* at 776-77.

2.     Analysis

First, we evaluate the seriousness of the irregularity. The trial court ruled that the parties could not reference any gang affiliation. However, the court noted that prejudice could be "ameliorated by use of the word 'nickname' as opposed to street name [or] gang affiliation name." RP at 87. During her testimony, James referred to Abernathy as "Havoc" and said that it was his "nickname." RP at 292. James' testimony was not a serious irregularity because she referred to Havoc as Abernathy's nickname, and not as his gang name.

Second, James' testimony about Abernathy's nickname was not cumulative of other evidence. Nobody else mentioned Abernathy's nickname.

Third, we evaluate whether the irregularity could be cured by an instruction to disregard the remark. The trial court immediately instructed jurors to disregard James' testimony as non-responsive. And we presume that the jury follows such instructions. *Emery*, 174 Wn.2d at 766.

8

Based on these factors, we conclude that there is not a substantial likelihood that the mention of Abernathy's nickname affected the jury's verdict.

Abernathy argues that this case is similar to that in *State v. Escalona*, 49 Wn. App. 251, 742 P.2d 190 (1987). In that case, a witness improperly testified that the defendant had a criminal record and previously had stabbed someone. *Id*. at 253. The court held that a curative instruction given to the jury was insufficient to ensure a fair trial. *Id*. at 256. The court stated that the improper statement was very serious because it described propensity behavior similar to the charged crime and was likely to impress itself on the minds of the jurors. *Id*. at 255-56. The court also highlighted the "paucity of credible evidence" against Escalona, noting that the witness's testimony was essentially the State's entire case, and contained inconsistencies. *Id*. at 255.

Unlike in *Escalona*, James did not testify that Abernathy had been convicted of a similar crime to the one charged. She merely referred to Abernathy by his nickname. And there is not a paucity of credible evidence in this case as there was in *Escalona*. Abernathy and Killian-Horace exchanged words in the grocery store parking lot. Both Abernathy and the shooter drove a red Mustang. James testified that Abernathy followed her in the red Mustang a few minutes after the alteration in the parking lot. Two witnesses saw the driver of a red Mustang convertible shoot into a dark colored car. One witness called 911 at 6:59 P.M., 11 minutes before James called 911 when she got home. James's daughter confirmed that the shooter was the same person from the grocery store parking lot.

We hold that the trial court did not abuse its discretion in denying Abernathy's mistrial motion.

C.    CONSECUTIVE SENTENCES FOR FIREARM ENHANCEMENTS

Abernathy argues that the trial court erred when it failed to exercise discretion to impose an exceptional sentence downward with respect to the firearm sentencing enhancements. The State argues that Abernathy cannot make this argument on appeal because he did not object to the issue in the trial court and he invited any error. We agree that Abernathy invited the error.

The invited error doctrine is applicable when the defendant either affirmatively assents to the error, materially contributes to it, or benefits from it. *State v. Momah*, 167 Wn.2d 140, 154, 217 P.3d 321 (2009). Here, Abernathy's attorney agreed that the mandatory sentencing enhancements had to be served consecutively, acknowledging that the trial court did not have any discretion with regard to the firearm sentencing enhancements by operation of the legislature. Therefore, Abernathy assented to and materially contributed to the alleged error. Accordingly, we decline to address this claim.[2]

D.    SAG CLAIMS

1.    Spousal Testimony

Abernathy claims that he received ineffective assistance of counsel when defense counsel failed to get his consent to allow Moriah to testify during the trial in violation of RCW 5.60.060.

But this assertion relies on matters outside the record. As a result, we cannot consider it on direct appeal. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). This assertion is more properly raised in a personal restraint petition. *Id*.

---

[2] In any event, the law is clear that trial courts lack the discretion to run firearm sentencing enhancements concurrently. *State v. Brown*, 139 Wn.2d 20, 29, 983 P.2d 608 (1999); *Kelly*, 25 Wn. App. 2d at 886-88.

2.   Prosecutorial Misconduct

First, Abernathy claims that the State engaged in prosecutorial misconduct when it mentioned his nickname by referring to his email address during closing argument. The State did reference Abernathy's email address in its closing argument while it discussed a declaration that was filed by Abernathy in another case:

> The phone, if you remember, the owner was Vic Abby, and then the primary email address – or one of the email addresses was habivizzle15@gmail.com. You can go ahead, if you're wondering, you can look at State's Exhibit 91(c). You can see that – because this is an e-signed document, that it was sent to havivizzle15@gmail.com, that it was reviewed by havivizzle15@gmail.com, and actually e-signed by Havivizzle15@gmail.com on March 31st, 2022.

RP at 684. But there is no indication that "havivizzle15" was a gang name, and there is nothing about that email address that was inflammatory.

Even if referencing the email address was improper, Abernathy did not object to this statement during the trial. When the defendant fails to object at trial, a heightened standard of review requires the defendant to show that the conduct was " 'so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.' " *State v. Zamora*, 199 Wn.2d 698, 709, 512 P.3d 512 (2022) (alterations in original) (quoting *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). "In other words, the defendant who did not object must show the improper conduct resulted in *incurable* prejudice." *Zamora*, 199 Wn.2d at 709. If a defendant fails to make this showing, the prosecutorial misconduct claim is waived. *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021).

Here, there is no indication that any resulting prejudice was incurable. Again, there was no suggestion that Abernathy's email address suggested a gang name. And if Abernathy had objected, the trial court could have directed the jury to disregard the comment. Therefore, we conclude that Abernathy waived this claim.

Second, Abernathy claims that the State asked Killian-Horace leading questions and misled the jury, preventing a fair trial. It is true that the State asked two leading questions during its direct examination of Killian-Horace. However, defense counsel objected to the questions as leading and the trial court sustained the objections. Abernathy fails to explain how the State otherwise misled the jury or prevented him from receiving a fair trial. Accordingly, we reject his claim.

## CONCLUSION

We affirm Abernathy's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

VELJACIC, A.C.J.

VEE, J.